# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

United States of America,

                Plaintiff,

v.

Michael Berenson,

                Defendant.

Case No. 17-cr-20521
(Related Case No. 22-cv-10262)

Judith E. Levy
United States District Judge

Mag. Judge Anthony P. Patti

_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO VACATE SENTENCE [53]

Before the Court is Defendant Michael Berenson's motion to vacate his sentence under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), as codified at 28 U.S.C. § 2255. (ECF No. 53.) Because Berenson seeks relief under § 2255, this opinion refers to him as the Petitioner.

For the reasons set forth below, Petitioner's motion is denied.

## I.    Background

### A.    Criminal Conduct and Guilty Plea

In 2018, Petitioner pled guilty to participating in a coordinated effort to sexually exploit children who visited the "Chateen" website (which is referred to as "Website A" in many case materials). The conduct that led to Petitioner's plea is summarized in a decision by the United States Court of Appeals for the Sixth Circuit dismissing Petitioner's direct appeal in his criminal case:

> From at least January 2012 to November 1, 2014, [Petitioner] was part of a group of individuals that worked together with the goal and common objective to produce child pornography on a chatroom-based website ("Website A"). After the group disbanded, [Petitioner] continued to be active on Website A, producing child pornography, until the execution of a search warrant at his home on May 10, 2017.
>
> The child exploitation enterprise was sophisticated and complex. The group's members would pretend to be teenage boys or girls, target victims via social media, and work together to pressure victims to engage in masturbation, and other sexual acts, in web-based chatrooms. Those acts were recorded via web camera, and the videos were shared among the group, and sometimes with others. The group's members, including [Petitioner], would communicate with each other in what they called "base" chatrooms. In these chatrooms, the group members would strategize about how they could convince minor females to perform various sexual acts on web camera that the group could then record. Group members had

2

different roles, although a member could play more than one role or switch roles. There were "hunters," "talkers," "loopers," and "watchers." Hunters, for example, were tasked with visiting social media sites frequented by minors and convincing minor females to visit Website A. Talkers like [Petitioner] asked the minor victims to complete "dares," eventually escalating into sexual activity.

[Petitioner] recorded hundreds of minor female victims between January 1, 2012 and May 2017. He lied about his age and identity to convince minor females to engage in sexual activity on web camera. If such efforts were unsuccessful, [Petitioner] would use threats. [Petitioner] blackmailed at least ten minor females to engage in sexually explicit activity by threatening to share explicit images and videos of them with their Facebook contacts and teachers.

*United States v. Berenson*, 836 F. App'x 357, 358 (6th Cir. 2020).

Petitioner was arrested at his home in Seattle, Washington in May 2017. (ECF No. 53, PageID.1427.) He was indicted in the Eastern District of Michigan on eight charges related to the foregoing offenses on August 3, 2017. (ECF No. 1.) Although he was the only defendant named in the indictment, he was charged with conspiring with someone who resided in the Eastern District of Michigan. (*Id.* at PageID.2.)

Other defendants were charged around the same time in the Eastern District of Michigan with committing similar crimes involving the Chateen website. *See, e.g.*, Indictment, *United States v. Fuller et al.*,

3

No. 16-cr-20239 (E.D. Mich. Apr. 5, 2016), ECF No. 14; Indictment, *United States v. Eisley et al.*, No. 17-cr-20632 (E.D. Mich. Sept. 21, 2017), ECF No. 14; Indictment, *United States v. Maire et al.*, No. 2:18-cr-20128-SJM (E.D. Mich. Feb. 27, 2018), ECF No. 15. Each case focused on members of different "groups"—i.e., the "fans" group was charged in the *Fuller* matter (No. 16-cr-20239), the "Skype" group was charged in the *Eisley* matter (No. 17-cr-20632), and the "Bored" group was charged in the *Maire* matter (No. 18-cr-20128). (ECF No. 35, PageID.274.) Petitioner, by contrast, was part of the "Base" group. (*See id.* at PageID.272–274.)

Ultimately, Petitioner pleaded guilty to one count: Child exploitation enterprise, in violation of 18 U.S.C. § 2252A(g). His guilty plea was accepted by the Court on November 14, 2018. (*See* ECF No. 22 (plea agreement); ECF No. 44 (transcript of plea hearing).)

## B.   Counsel's Separate Representation of Daniel Walton

Petitioner was represented in all proceedings before this Court on his criminal case by attorney James Thomas, who entered an appearance as Petitioner's counsel in September 2017. (*See* ECF No. 3.)

4

Between November 2017 and December 2018, Mr. Thomas separately represented Daniel Walton, who was charged with a similar child-exploitation crime involving the Chateen website in a separate proceeding initiated in the Eastern District of Michigan. *See* Appearance, *United States v. Walton*, No. 2:17-mj-30563 (E.D. Mich. Nov. 14, 2017), ECF No. 5; Indictment, *United States v. Maire et al.*, No. 2:18-cr-20128-SJM (E.D. Mich. Feb. 27, 2018), ECF No. 15. Walton and his co-defendants in the *Maire* matter comprised the so-called "Bored" group of Chateen offenders, which did not include Petitioner or any other former member of the "Base" group. (*See* ECF No. 35, PageID.274.)

Judge Murphy accepted a guilty plea from Walton on June 19, 2018. *See* Plea Agreement, *United States v. Maire et al.*, No. 2:18-cr-20128-SJM (E.D. Mich. June 19, 2018), ECF No. 72; *see also* Minute Entry for Plea Hearing as to Daniel Walton, *United States v. Maire et al.*, No. 2:18-cr-20128-SJM (E.D. Mich. June 19, 2018).

Walton was sentenced to 366 months (30.5 years) of imprisonment in a judgment entered on December 11, 2018. *See* Judgment, *United States v. Maire*, No. 2:18-cr-20128-SJM (E.D. Mich. Dec. 11, 2018), ECF No. 155; *see also* Minute Entry, *United States v. Maire*, No. 2:18-cr-20128-

SJM (E.D. Mich. Dec. 6, 2018). Walton did not appeal or file a motion for post-conviction relief under 28 U.S.C. § 2255.

There is no record of Mr. Thomas informing the Court of any potential conflict arising from his overlapping representation of Walton at any point during his representation of Petitioner.[1]

## C. Sentencing

The government filed its initial sentencing memorandum in Petitioner's criminal case on April 15, 2019. (*See* ECF No. 28 (filed and placed under seal on April 15, 2019); *see also* ECF No. 35 (filed publicly with redactions on April 17, 2019).) The memorandum stated, among other things:

> *Berenson is the most culpable Website A offender so-far sentenced. No other offender comes close.* The technological sophistication, the blackmail, the threats, the distribution of

---

[1] Although the *Maire* matter in which Walton was a defendant was initially assigned to the undersigned following the filing of the indictment on February 27, 2018, the case was soon thereafter deemed to be related to an already-pending matter assigned to Judge Murphy and was thus reassigned to Judge Murphy on March 13, 2018. *See* Order Regarding Reassignment of Companion Case, *United States v. Maire et al.*, No. 2:18-cr-20128-SJM (E.D. Mich. Mar. 13, 2018), ECF No. 38. Prior to the reassignment, the undersigned entered the parties' stipulated protective order to protect against disclosure of sensitive information relating to the case. *See* Stipulation and Order of Protection, *United States v. Maire et al.*, No. 2:18-cr-20128-SJM (E.D. Mich. Mar. 1, 2018), ECF No. 22. The undersigned took no other action in the *Maire* case in the two weeks that elapsed between the filing of the indictment and its reassignment to Judge Murphy.

the videos he made, the callousness, his obsession with suicide and self-harm, the size of his collection, the duration of his conduct, the harm to his victims—all of these put him in an entirely different category of evil. *Other offenders in this case have received life-equivalent sentences of 40 or 41 years' imprisonment whose conduct is much less egregious than that of Berenson.* To sentence Berenson to less than a life-equivalent sentence would create unwarranted sentencing disparities whereas a life sentence will not.

(ECF No. 35, PageID.313–314 (emphasis added).)

Petitioner filed his sentencing memorandum under seal on April 18, 2019. (*See* ECF No. 36 (SEALED).) The memorandum argued that Petitioner's autism warranted a more lenient sentence than the life sentence requested by the government. (*See id.* at PageID.326–327, PageID.345.) In support of this argument, counsel submitted an independent psychiatric evaluation completed by Dr. George F. Parker, M.D., a Professor of Clinical Psychiatry at the Indiana University School of Medicine. (*See id.* at PageID.407–414.) Dr. Parker offered his "opinion, with reasonable medical certainty, that the characteristics of [Petitioner's] autism spectrum disorder contributed to the behavior that led to the current federal charges against him." (*Id.* at PageID.414.) Counsel also provided the Court with copies of articles that address the role that autism may play in criminal conduct, including crimes of a

sexual nature.[2] And counsel submitted letters from Petitioner's mother and others who could speak to his character. (*Id.* at PageID.723–739.)

The Court held a sentencing hearing on April 22, 2019. (*See* ECF No. 46 (transcript).) The hearing began with victim-impact statements offered by some of Petitioner's minor victims (MV-1, MV-2, MV-3, MV-5, MV-6, MV-8, and MV-24) as well as the parents and/or guardians of some of his victims (MV-1, MV-5, MV-6, MV-17, MV-18, MV-21, MV-24, and MV-25). (*See generally id.* at PageID.854–913.) Victims and their parents described instances in which Petitioner blackmailed his victims and

---

[2] *See* T. Higgs & A. Carter, *Autism spectrum disorder and sexual offending: Responsivity in forensic interventions*, 22 AGGRESSION & VIOLENT BEHAVIOR 112–19 (2015) (PageID.398–405); K. Richman & R. Bidshahri, *Autism, theory of mind, and the reactive attitudes*, 32 BIOETHICS 43–49 (2018) (PageID.416–422); S. Curtiss & A. Ebata, *Building Capacity to Deliver Sex Education to Individuals with Autism*, 34 SEX DISABILITY 27–47 (2016) (PageID.424–444); D. Sugrue, *Forensic Assessment of Individuals on the Autism Spectrum Charged with Child Pornography Violations*, CAUGHT IN THE WEB OF THE CRIMINAL JUSTICE SYSTEM ch. 5 (PageID.445–455); M. Mogavero, *Autism, sexual offending, and the criminal justice system*, 7 J. OF INTELLECTUAL DISABILITIES & OFFENDING BEHAVIOR 116–26 (2016) (PageID.460–470); C. Allely & A. Creaby-Attwood, *Sexual offending and autism spectrum disorders*, 7 J. OF INTELLECTUAL DISABILITIES & OFFENDING BEHAVIOR 35–51 (2016) (PageID.473–489); B. Haskins & J. Silva, *Asperger's Disorder and Criminal Behavior: Forensic-Psychiatric Considerations*, 34 J. OF AM. ACAD. OF PSYCHIATRY & THE LAW 374–84 (2006) (PageID.492–502); I. Freckelton & D. List, *Asperger's Disorder, Criminal Responsibility and Criminal Culpability*, 16 PSYCHIATRY, PSYCHOLOGY & THE LAW 16–40 (2009) (PageID.641–665).

directed them to self-harm and outlined the devastating effect that Petitioner's conduct had on their lives. (*See id.*)

Following these presentations, the Court heard from the government's attorney and from counsel for Petitioner. Petitioner's counsel acknowledged the gravity of his crimes but urged the Court to impose the mandatory-minimum sentence of twenty years. (*Id.* at PageID.938–954.) Counsel emphasized the role that autism had played in Petitioner's life and the extent to which it may have contributed to his criminal conduct. (*See id.* at PageID.946, PageID.950, PageID.954.) He also argued that Petitioner was at a high risk of being targeted by fellow prisoners due to his autism and the nature of his crimes and advocated for a sentence that would give Petitioner the best chance of avoiding such harm while obtaining necessary treatment to prevent him from re-offending. (*Id.* at PageID.942–944, PageID.948, PageID.963–965.)

Petitioner also spoke on his own behalf. He apologized for what he had done and acknowledged that he "knew it was wrong." (*Id.* at PageID.954–956.)

The Court then explained its decision to impose a 55-year (660-month) prison sentence to be followed by five years of supervised release.

9

It explained that a "significant custodial sentence is required and warranted in this case to reflect the terribly serious nature of the offense." (*Id.* at PageID.962.) The Court also highlighted the fact that Petitioner continued to exploit children online even after a detective with the Seattle Police Department visited his home and told him that he was being investigated and even after one of his minor victims called his home and spoke to his mother. (*Id.*) In light of Petitioner's persistence in carrying out his criminal conduct, the Court explained that it felt it had "no choice . . . but to impose a sentence that will protect [the children who appeared at the sentencing hearing] and others from [Petitioner]." (*Id.* at PageID.962–963.)

> As to Petitioner's autism, the Court stated:

> I have to commend Mr. Thomas. His sentencing memo was thorough and balanced and compelling. You did an excellent job presenting the strongest possible argument in your sentencing memo. But none of the articles—and I think you've said as much—indicated that torturing vulnerable children is associated with autism.

> Perhaps the perseveration. Perhaps the quantity. But he's not being sentenced for the quantity. I will not punish you more or less because of your autism. . . .

> . . .

. . . You were born with autism. And it is both a burden to you and your family. But it can also be a gift. You can stay focused in a way that other people can't on something and develop incredible capacity. But you used your talents in an evil and unspeakable way.

(*Id.* at PageID.959–961.)

On April 29, 2019, the Court entered a judgment memorializing the sentence. (*See* ECF No. 41, PageID.768–769.)

## D. Direct Appeal

Petitioner filed a timely appeal of the judgment entered in his criminal case on May 13, 2019. (ECF No 42.) Among other things, his appeal raised two issues that he raises in his § 2255 motion: (1) trial counsel was ineffective due to his overlapping representation of Walton and (2) counsel was constitutionally ineffective in connection with his presentation of Petitioner's autism at sentencing. (*See* ECF No. 53, PageID.1455–1456.)

The Sixth Circuit dismissed Petitioner's appeal in an opinion issued on November 10, 2020. *See United States v. Berenson*, 836 F. App'x 357, 362 (6th Cir. 2020). The court explained that "[t]his is not one of the 'rare cases where [counsel's] error is apparent from the existing record,' so consideration of [Petitioner]'s ineffective assistance of counsel claims is

11

properly deferred in the first instance to a post-conviction proceeding under 28 U.S.C. § 2255." *Id.* at 359.

### E.    Petitioner's § 2255 Motion

On February 8, 2022, Petitioner filed a motion for post-conviction relief under 28 U.S.C. § 2255. (ECF No. 53.) Petitioner did not submit his own affidavit with his motion or obtain one from his former defense counsel, Mr. Thomas. Rather, he submitted an affidavit by Mark J. Mahoney, a New York-based attorney who specializes in representing autistic people who are charged with crimes. (*See* ECF No. 54, PageID.1498.) Mr. Mahoney explained how he would have gone about developing information about Petitioner's autism and presenting this information to the Court and suggested that the differences between his preferred approach and that taken by Mr. Thomas may have prejudiced Petitioner. (*See generally id.* at PageID.1540–1575.)

Petitioner's § 2255 motion is fully briefed. (ECF Nos. 61, 64.)

## II.    Legal Standard

An inmate in federal custody who files a motion to "vacate, set aside, or correct [his] sentence" under AEDPA must demonstrate "that the sentence was imposed in violation of the Constitution or laws of the

12

United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a).

"A motion brought under § 2255 must allege one of three bases as a threshold standard: (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001) (citing *United States v. Addonizio*, 442 U.S. 178, 185–86 (1979)).

## III.   Analysis

### A.   Timeliness

The Court first addresses the timeliness of Petitioner's motion. 28 U.S.C. § 2255(f), which sets forth the period of limitations for such a motion, states:

> A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of—
>
> > (1) the date on which the judgment of conviction becomes final;
> >
> > (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the

movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).

Here, the Court entered a judgment against Petitioner on April 29, 2019. (ECF No. 41.) Petitioner filed a timely appeal on May 13, 2019. (ECF No. 42.) The Sixth Circuit dismissed Petitioner's appeal in an opinion issued on November 10, 2020. (ECF No. 51.) Because Petitioner did not thereafter petition the Supreme Court for certiorari, the judgment against him became final on the last day on which a petition for certiorari *could have been* filed. *See Kemp v. United States*, 596 U.S. 528, 531 (2022); *Clay v. United States*, 537 U.S., 522, 527 (2003). Under the Supreme Court's Rules, the judgment against Petitioner thus became final on February 8, 2021. *See* Sup. Ct. R. 13.1 (setting deadline of "90 days after entry of the judgment" to petition for certiorari).

14

Petitioner's § 2255 motion (ECF No. 53) was filed on February 8, 2022—exactly one year after the judgment against Petitioner became final for purposes of seeking postconviction relief. The motion was therefore timely. *See* 28 U.S.C. § 2255(f)(1).

## B.    Alleged Conflict of Interest

Petitioner argues that his counsel (James Thomas) operated under a conflict of interest due to his overlapping representation of a defendant (Daniel Walton) who was indicted in the Eastern District of Michigan on a similar crime involving the Chateen website. (*See* ECF No. 53, PageID.1467–1470.) As set forth above, Mr. Thomas's representation of Walton began in November 2017 and concluded after Walton was sentenced by Judge Murphy in December 2018.

Petitioner's conflict-of-interest argument rests on a portion of the government's April 2019 sentencing memorandum that stated:

> Of the more than 27 offenders apprehended and charged in the Eastern District of Michigan for their conduct on Website A, and the more than half-dozen that have been located elsewhere in the United States, Michael Berenson is by far the most culpable.

(ECF No. 35, PageID.270.) There is no dispute that Walton is one of the "more than 27 offenders apprehended and charged in the Eastern District

15

of Michigan for their conduct on Website A." Petitioner argues that Mr. Thomas's representation of Walton created a conflict of interest that prevented him from offering a meaningful rebuttal to the government's argument that Petitioner was "by far the most culpable" among a group of defendants (including Walton) that had committed similar offenses. (*See* ECF No. 53, PageID1468–1469.) The argument seems to go something like this: if Mr. Thomas had not represented Walton at an earlier time, he might have argued that Walton, who was already sentenced by Judge Murphy, was the most culpable, not Petitioner.

Petitioner's conflict-of-interest argument is not subject to the usual *Strickland* standard for establishing ineffective assistance of counsel. "Ordinarily, to prevail on an ineffective-assistance-of-counsel claim, a petitioner must show that his counsel's performance was deficient and that the deficiency so prejudiced his defense that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Jalowiec v. Bradshaw*, 657 F.3d 293, 314 (6th Cir. 2011), *as amended* (Nov. 23, 2011) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "However, prejudice is presumed if counsel is

shown to have been burdened by an actual conflict of interest." *Id.* (citing *Strickland*, 466 U.S. at 692).

To satisfy the conflict-of-interest exception to *Strickland*'s prejudice requirement, a defendant must "demonstrate[] that counsel 'actively represented competing interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland*, 466 U.S. at 692 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980)). At the first prong, a defendant "must point to specific instances in the record that suggest an actual conflict or impairment of . . . interests." *Moss v. United States*, 323 F.3d 445, 463 (6th Cir. 2003) (quoting *Thomas v. Foltz*, 818 F.2d 476, 481 (6th Cir. 1987)). A court may not "find an actual conflict" unless a defendant makes a "factual showing of inconsistent interests." *Id.* (quoting *Thomas*, 818 F.2d at 481). "[I]f the conflict is as to a matter that is irrelevant or the conflict is merely hypothetical, there is no constitutional violation." *Id.* at 463–64 (citing *Sullivan*, 446 U.S. at 350). At the second prong, a defendant must show that his attorney was "influenced in his basic strategic decisions by the interests of [his other] client," *Jalowiec*, 657 F.3d at 317, and "made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence

helpful to one client but harmful to the other," *Moss*, 323 F.3d at 466 (quoting *Thomas*, 818 F.2d at 481).

Turning to the first prong, the question here is whether Mr. Thomas "actively represented competing interests" (*Sullivan*, 446 U.S. at 350) at the time the government described Petitioner's relative culpability in an April 2019 sentencing memorandum.[3] He did not. At the time the government made the statement about Petitioner's culpability, Walton had already been sentenced by Judge Murphy and the deadline to appeal that sentence had already elapsed. Thus, nothing Mr. Thomas did with respect to Petitioner's sentencing (including his response to the government's April 2019 statement regarding Petitioner's relative culpability) could have aided Walton in any manner. Petitioner has not made the requisite "factual showing of inconsistent interests" that the law requires. *Moss*, 323 F.3d at 463 (quoting *Thomas*, 818 F.2d at 481).

---

[3] Given that Petitioner argues solely that a conflict of interests affected how his counsel responded to a statement made in April 2019, the Court need not decide whether counsel represented conflicting interests during the period in which he actively represented both Petitioner and Walton (*e.g.*, November 2017 through December 2018), as any conflict during that period would be irrelevant to Petitioner's argument. *See Moss*, 323 F.3d at 463–64 (explaining that "there is no constitutional violation" if there is a conflict "as to a matter that is irrelevant").

Because Petitioner has not shown that Mr. Thomas actively represented conflicting interests at the time the government filed its sentencing memorandum in his criminal case in April 2019, Petitioner's conflict-of-interest argument fails, and prejudice will not be presumed. His counsel's response to the government's sentencing memorandum is instead subject to the *Strickland* standard for establishing ineffective assistance of counsel, which is addressed in the next section.

## C.     Effective Assistance of Counsel Under *Strickland*

Petitioner argues that, as a general matter, he is entitled to relief under 28 U.S.C. § 2255 because he was denied effective representation by counsel at the sentencing phase of his case. This argument also fails.

To prevail on his ineffective-assistance-of-counsel claim, Petitioner must satisfy the two-pronged standard established in *Strickland v. Washington*, 466 U.S. 668 (1984). Petitioner "must demonstrate (1) that counsel's representation at sentencing fell below an objective standard of reasonableness and (2) that a reasonable probability exists that, but for his attorney's unprofessional representation, the result of the proceeding would have been different." *Snider v. United States*, 908 F.3d 183, 192 (6th Cir. 2018) (citing *Strickland*, 466 U.S. at 687–88).

19

When conducting this inquiry, "a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "The Sixth Amendment 'does not guarantee perfect representation' but only 'reasonably competent' representation." *Moody v. United States*, 958 F.3d 485, 492 (6th Cir. 2020) (quoting *Harrington v. Richter*, 562 U.S. 86, 110 (2011)). An attorney's "decisions only become deficient—that is, incompetent—when no reasonable counsel would have made the same choice at the time." *Id.* (citing *Strickland*, 466 U.S. at 690).

Petitioner raises three potential grounds for finding his attorney constitutionally ineffective. His primary argument is that his counsel failed to adequately communicate the role that autism played or may have played with respect to his criminal conduct and culpability. (*See* ECF No. 53, PageID.1475–1477, PageID.1480–1492.) Petitioner also argues that his counsel failed to adequately rebut a statement by the government regarding his relative culpability as compared to other defendants who were charged with similar crimes. (*See id.* at PageID.1468–1469.) Finally, Petitioner argues that his counsel failed to raise certain objections and otherwise failed to adequately advocate for

20

him at sentencing. (*See id.* at PageID.1478–1479.) None of these grounds involved ineffective assistance under *Strickland* and, thus, none provides a basis to vacate Petitioner's sentence.

### i. *Autism Spectrum Disorder*

Petitioner maintains that, due to his admission of guilt and the strength of the evidence against him, "the only chance he had for leniency if sentenced by Judge Levy was his Pervasive Developmental Disorder – a particularly crippling form of Autism Spectrum Disorder." (ECF No. 53, PageID.1475.) He argues that he was deprived of representation under the Sixth Amendment because his trial counsel "failed time and again to present this defense competently." (*Id.* at PageID.1476.)

As an initial matter, this argument proceeds from the faulty premise that Petitioner's Autism Spectrum Disorder constituted a "defense." It was not. Petitioner pled guilty to sexual exploitation of children, and he does not dispute that a straightforward application of the advisory sentencing guidelines based on his Total Offense Level (43) and Criminal History Category (I) resulted in a sentence of lifetime imprisonment. While his counsel was free to argue that his autism warranted a larger downward variance than what the Court ultimately

granted, the Court was not obligated to accept that argument. *See United States v. Curry*, 170 F.4th 559, 571 (6th Cir. 2026) (affirming the substantive reasonableness of a mid-guidelines sentence where the district court considered the defendant's "physical and mental health conditions" and "simply determined that other sentencing factors carried more weight, as it was entitled to do so"); *United States v. Owen*, 940 F.3d 308, 317 (6th Cir. 2019) ("While a district court should, in the sentencing context, give consideration to a defendant's mental illness, the court is not required to grant a defendant's motion for a downward variance whenever a defendant suffers from such an illness.").

Further, Petitioner's brief understates the extent to which Mr. Thomas highlighted his autism throughout the sentencing process. Mr. Thomas arranged for Dr. George F. Parker M.D., a Clinical Professor of Psychiatry at the Indiana University School of Medicine, to evaluate Petitioner's condition and to evaluate the role that autism may have played in the conduct with which he was charged.[4] In both his written

---

[4] Petitioner argues that his trial counsel failed to provide Dr. Parker with all necessary materials and failed to direct him to test Petitioner's "adaptive functioning." (ECF No. 53, PageID.1482–1483.) He also suggests that Dr. Parker lacked "the expertise required to conduct the needed evaluation and explore the necessary issues bearing on the resolution of the case." (*Id.* at PageID.1484.)

22

and oral presentations to the Court, Mr. Thomas noted Dr. Parker's finding that Petitioner's autism contributed to the conduct that led to his arrest. (*See, e.g.*, ECF No. 36 (SEALED), PageID.335; ECF No. 46, PageID.949.) Mr. Thomas collected and submitted articles in which researchers reported the role that autism may play in certain criminal conduct. (*See* footnote 2, *supra*.) And, as noted above, Mr. Thomas argued that Petitioner's autism warranted a substantial downward variance from the life sentence that was requested by the government and that would have constituted a Guidelines sentence. (*See* ECF No. 36

---

Petitioner fails to support his argument that Dr. Parker was in fact unqualified to serve as an expert in this case. He also offers no reason to conclude that counsel was constitutionally ineffective in not directing Dr. Parker to conduct additional testing or in not hiring a different expert. *See Neuhard v. United States*, 119 F.4th 1064, 1070–71 (6th Cir. 2024) (rejecting argument that "it should have been obvious to [the petitioner's trial counsel] that he needed to perform more research and introduce autism evidence because a new expert report, commissioned in connection with habeas proceedings, concluded that [the petitioner] was more seriously affected by autism than the prior experts had opined," where the petitioner failed to "clearly explain why having a more-severe diagnosis would have mattered" and where counsel undertook a "reasonable" investigation with respect to the petitioner's autism), *cert. denied*, 145 S. Ct. 1975 (2025); *see also Holder v. United States*, 721 F.3d 979, 996–97 (8th Cir. 2013) (concluding that "counsel has no obligation to shop for a better opinion" regarding a defendant's mental health where counsel "obtained the assistance of a qualified expert . . . and nothing ha[d] happened that should have alerted counsel to any reason why the expert's advice was inadequate" (quoting *Marcrum v. Luebbers*, 509 F.3d 489, 511 (8th Cir. 2007))).

(SEALED), PageID.326–327, PageID.345; *see also* ECF No. 46, PageID.946, PageID.950, PageID.954.)

Ultimately, Petitioner appears to be arguing that his counsel should have done *more* to emphasize how his autism may have contributed to his criminal conduct. But "'[t]he test for ineffectiveness is not whether counsel could have done more;' it is merely whether counsel did enough." *Neuhard v. United States*, 119 F.4th 1064, 1070 (6th Cir. 2024) (quoting *Waters v. Thomas*, 46 F.3d 1506, 1518 (11th Cir. 1995)), *cert. denied*, 145 S. Ct. 1975 (2025); *see also United States v. Wright*, No. 2:18-CR-20302-1, 2021 WL 3700868, at *3 (E.D. Mich. Aug. 20, 2021) (rejecting argument that, to be effective at sentencing, an attorney must present every available study addressing a particular issue, because "an excessive standard like that one would hold attorneys to conduct well beyond what *Strickland* requires"). Here, Mr. Thomas drew the Court's attention to the potential effects of Petitioner's Autism Spectrum Disorder on his criminal conduct and provided ample expert and academic literature to support his argument. Petitioner thus fails to demonstrate that his "counsel's representation at sentencing fell below an objective standard of reasonableness." *See Snider*, 908 F.3d at 192; *see*

24

*also, e.g.*, *Black v. United States*, No. CR 10-20225, 2017 WL 405933, at *5 (E.D. Mich. Jan. 31, 2017) (holding that an attorney met the objective standard of reasonableness with respect to presenting potentially mitigating evidence regarding the defendant's mental health at sentencing where the "materials submitted by . . . counsel to the Court in preparation for . . . sentencing made ample reference to the mental health of [the defendant] . . . and counsel also addressed this specific subject at the sentencing hearing"), *aff'd*, No. 17-1149, 2018 WL 832962 (6th Cir. Jan. 16, 2018).

Although the adequacy of Mr. Thomas' representation is alone dispositive, the Court will briefly address *Strickland*'s second prong, which looks at whether a defendant was prejudiced by his counsel's purportedly ineffective representation. Here, Petitioner fails to demonstrate a "reasonable probability" that "the result of the proceeding would have been different" (*Snider*, 908 F.3d at 192) had Mr. Thomas done even more to emphasize how Petitioner's autism may have affected his conduct. During sentencing, the Court explained that a "significant custodial sentence is required and warranted in this case to reflect the terribly serious nature of the offense." (ECF No. 46, PageID.962.) The

Court also highlighted the fact that Petitioner continued to exploit children online even after a detective with the Seattle Police Department visited his home and told him that he was being investigated and even after one of his minor victims called his home and spoke to his mother. (*Id.*) In light of Petitioner's persistence in carrying out his criminal conduct, the Court explained that it had "no choice . . . but to impose a sentence that will protect [the children who appeared at the sentencing hearing] and others from [him]." (*Id.* at PageID.962–963.) Further, the Court already varied downward from the advisory guidelines and sentenced Petitioner to 660 months in prison rather than imposing the life sentence requested by the government.

In sum, Petitioner was not prejudiced even if counsel had been ineffective in presenting his autism to the Court. *See Owen v. United States*, No. 1:20-CV-24, 2022 WL 17744049, at \*7 (E.D. Tenn. Dec. 16, 2022) (holding that a petitioner was not prejudiced by his counsel not calling an expert witness to testify at sentencing regarding the defendant's mental illness where the court had already concluded that the defendant suffered from mental illness but nevertheless determined

that a downward variance would be inappropriate based on a consideration of all of the § 3553(a) factors).

### ii. Relative Culpability

Petitioner also argues that his counsel should have "squarely challenged" the government's description of Petitioner as "by far the most culpable" out of a group of 27 offenders charged with similar child-exploitation crimes in the Eastern District of Michigan. (*See* ECF No. 53, PageID.1469.) He contends that the government's statement was "demonstrably untrue" because (1) Petitioner testified that he was "the last one in the group and . . . the first one out of the group," and (2) he is autistic. (ECF No. 53, PageID.1469.)

As with Petitioner's attack on his counsel's presentation of his autism, this argument also fails to establish that his counsel was constitutionally ineffective. As an initial matter, Petitioner overstates the facts when he argues that the government's statement was "demonstrably untrue." Petitioner's testimony that he was the "last one in" and the "first one out" of the "Base" group does not tell the whole story, as Petitioner continued to exploit children online (including on Chateen) from the time he left the "Base" group until his arrest in 2017.

27

(*See* ECF No. 35, PageID.276; *see also* ECF No. 45, PageID.836–837 (sworn testimony by Petitioner that he would "convince underage girls to take their clothes off and perform sex actions in front of a video camera . . . [b]etween 2012 and 2014 as a group and on my own after that").) Further, Petitioner ignores the specific conduct that led the government to characterize him as more culpable than other defendants, which included (1) demanding that his victims engage in self-harm; (2) hacking into the web cameras and even hard drives of the children he was exploiting; and (3) blackmailing several of his victims by threatening to expose their online activities or to otherwise harm them and their loved ones if they did not continue to engage in sexual activities over their webcams at his demand. (*See, e.g.*, ECF No. 35, PageID.313–314; *see also* ECF No. 46, PageID.926–927.) Petitioner's autism does not absolve him of his criminal conduct or necessarily render him less culpable than others charged with committing similar crimes.

In any event, Petitioner fails to explain how his trial counsel provided constitutionally ineffective assistance with respect to the government's statement regarding his relative culpability. He does not dispute the accuracy of the facts that led the government to describe him

28

as the most culpable, and, thus, he fails to explain what his counsel could have done to rebut this statement.[5] Further, the record shows that

---

[5] Petitioner posits that the government submitted memoranda in other cases that described other defendants "in worse terms than [Petitioner]," and criticizes his trial counsel for failing to "explore this." (ECF No. 53, PageID.1486.) But his characterization of the government's sentencing memoranda is not borne out by the examples he cites. (*See id.* at PageID.1486–1487 (characterizing John Garrison, who was sentenced by the undersigned in 2017 to 440 months in prison, as having been tied directly to an attempted suicide, possessing "three times the number of child pornography videos of any other defendant," having "alone produced tens of thousands of child pornography videos," and as "persistently seeking . . . out [his victims] for years at a time" (quoting Sentencing Memorandum, *United States v. Fuller et al.*, No. 16-cr-20239 (E.D. Mich. Sept. 5, 2017), ECF No. 289); characterizing Felipe Dominquez-Mejia, who was sentenced by Judge Murphy in 2018 to 492 months in prison, as "the most aggressive talker of the so-far convicted defendants," as having "enticed little girls to engage in sexual acts with their pet dogs," and as having "seemed to take a particular interest in girls who engaged in self harm" (quoting Sentencing Memorandum, *United States v. Eisley et al.*, No. 17-cr-20632 (E.D. Mich. July 10, 2018), ECF No. 128); and characterizing Justin Fuller, who was sentenced in 2017 to 420 months in prison by the undersigned, as possessing a video that showed a minor victim cutting herself and another video that showed his minor victim engaging in conduct with "her seven-year old sister" (quoting Sentencing Memorandum, *United States v. Fuller et al.*, No. 16-cr-20239 (E.D. Mich. Sept. 7, 2017), ECF No. 300).) None of these defendants engaged in the combination of hacking, stalking, blackmail, and direction to engage in self-harm that characterized Petitioner's conduct.

Further, Petitioner is incorrect in asserting that the government described Dominquez-Mejia and Fuller as "the worst." (ECF No. 53, PageID.1486–1487.) The government described Dominguez-Mejia as "one of the *most culpable of the so far convicted defendants*" (which did not include Petitioner), asserted that "the content on [Dominguez-Mejia's] devices and the graphic nature of his chats with minors sets him apart in the worst of ways from his fellow coconspirators" in the "Skype" group, and further asserted that he had "the worst content and chats of *any of the so far convicted defendants*" (which, again, did not include Petitioner). Sentencing Memorandum at PageID.1662, PageID.1665, & PageID.1668, *United States v. Eisley*

29

counsel specifically pointed to Petitioner's autism when responding to the government's argument regarding his relative culpability (ECF No. 36 (SEALED), PageID.345) and also objected generally to the government's "highly inflammatory argument" and its "demoniz[ing]" of Petitioner. (*Id.* at PageID.324–325.) The record also shows that counsel endeavored to portray Petitioner sympathetically and to explain how his autism and related developmental delays may have contributed to his criminal conduct. (*See, e.g.*, ECF No. 36 (SEALED), PageID.326–327 (explaining the potential role of his autism); ECF No. 46, PageID.948–949 (arguing that Petitioner is not a "monster" and his conduct must be understood in the context of his autism); *id.* at PageID.950 (explaining that Petitioner

---

*et al.*, No. 17-cr-20632 (E.D. Mich. July 10, 2018), ECF No. 128 (emphasis added). With respect to Fuller (who participated in the "fans" group from 2014 to 2016), the government explained in its September 2017 sentencing memorandum that "[e]ven in comparison to this subset of offenders, the content of Fuller's videos sets him apart in the worst possible way." Sentencing Memorandum at PageID.6202 & PageID.6227, *United States v. Fuller et al.*, No. 16-cr-20239 (E.D. Mich. Sept. 7, 2017), ECF No. 300.

Finally, Petitioner's trial counsel had good reason not to engage the government and the Court in a detailed argument regarding how Petitioner's conduct compared to that of other defendants. Going down that road carried a high risk of further highlighting the depravity of Petitioner's crimes and the degree of harm he caused. *See Moody v. United States*, 958 F.3d 485, 492 (6th Cir. 2020) (explaining that counsel can only be found ineffective "when no reasonable counsel would have made the same choice at the time"). Under these circumstances, it was reasonable for counsel to object generally to the government's demonizing of Petitioner and to argue that his autism warranted a more lenient sentence, as Mr. Thomas did here.

is a "human being with a condition . . . that he was born with" and not a "psychopath," "monster," or "animal"); *id.* ("My focus was to get away from the moral outrage. And that's a hard thing to do because this involves sexuality in human beings and hidden behavior.").)

Further, Petitioner suffered no prejudice even if *Strickland* required his counsel to respond differently to the government's statement regarding his relative culpability. As set forth above, there is no dispute that Petitioner was unique in exercising control over his victims' computers, stalking and blackmailing his victims, and insisting that his victims engage in self-harm. (*See, e.g.*, ECF No. 46, PageID.957–958.) Given that these facts independently supported the conclusion that he was more culpable than other defendants who were charged with sexually exploiting children on the Chateen website, he was not prejudiced by any failure by his counsel to attempt to rebut the government's description of his relative culpability. *See Smith v. Mitchell*, 348 F.3d 177, 206 (6th Cir. 2003) (concluding that a defendant who claimed ineffective assistance was not prejudiced by his counsel's "fail[ure] to rebut testimony that [he] lacked remorse" during sentencing in "light of the overwhelming aggravating (as well as mitigating)

31

evidence presented," the fact that this statement was made to judges rather than a jury, and the fact that his "own confession independently revealed his lack of remorse").

### iii. Other Alleged Deficiencies

In addition to the more detailed arguments regarding autism and relative culpability, Petitioner offers a handful of other critiques of his counsel's performance. (*See, e.g.*, ECF No. 53, PageID.1478–1479.) None of these arguments demonstrate ineffective assistance under *Strickland.*

Petitioner first appears to suggest that his trial counsel should have objected to the pre-sentence report on grounds that the investigator had not interviewed the Petitioner's parents. (*Id.* at PageID.1478.) He does not, however, explain why such interviews were necessary or how he was prejudiced by the failure to conduct them. In any event, any prejudice was ameliorated by the fact that Petitioner's own expert (Dr. Parker) spoke with and obtained background information from Petitioner's mother that is reflected in the report that counsel submitted with Petitioner's sentencing materials. (*See* ECF No. 36 (SEALED), PageID.407, PageID.411.) Petitioner also submitted a letter in which his

mother offered her perspective and asked for leniency. (*See id.* at PageID.723–725.)

Petitioner also criticizes his counsel's response to the presentation of a video message by Amanda Todd (a girl who committed suicide after being exploited online) as well as the victim-impact statement by Ms. Todd's mother. (*See* ECF No. 53, PageID.1443–1444, PageID.1478.) Petitioner claims that his counsel "neither objected nor made any statement to clarify for Judge Levy that [Petitioner] had no part whatsoever in [Ms. Todd's] death." (*Id.* at PageID.1478.) That is not true: At the sentencing hearing, Petitioner's counsel specifically noted the absence of evidence that Petitioner had communicated with Ms. Todd and objected to the government's attempts to "lay her death specifically at his feet" as "an unfair argument." (ECF No. 46, PageID.939.) This objection forced the government to concede that it had no evidence of direct contact between Petitioner and Ms. Todd. (*Id.*) Counsel's objection sufficed to place the statements by Ms. Todd and her mother in their proper context.

Finally, Petitioner criticizes his defense counsel as having "barely defended" him in his presentation at the sentencing hearing. (ECF No. 53, PageID.1478.) He further criticizes his counsel's statement that it

33

was "[h]ard to sit here for three hours and not appreciate the harm that has been caused by his conduct" (ECF No. 46, PageID.938) as appearing to "condemn[] [Petitioner] as responsible for the harm caused to all the victims who had testified." (ECF No. 53, PageID.1478.) These arguments fail. In the wake of the emotionally charged statements provided by Petitioner's minor victims' and their families, it was reasonable for counsel to acknowledge the gravity of Petitioner's crimes so as to avoid creating the impression that Petitioner failed to appreciate the severity of his criminal conduct or otherwise lacked remorse.

In short, counsel met his obligation to provide constitutionally effective representation at sentencing.

### D.    Need for a Hearing

Finally, Petitioner is not entitled to an evidentiary hearing regarding his § 2255 motion. Petitioner has not presented any factual dispute that would warrant an evidentiary hearing. *See Martin v. United States*, 889 F.3d 827, 832 (6th Cir. 2018) ("[W]here there is a factual dispute, the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims . . . ." (cleaned up)); *see also Turner v. United States*, 183 F.3d 474, 476–77 (6th Cir. 1999) (holding that there

34

was no need to hold an evidentiary hearing on a § 2255 motion where the defendant failed to include "any statement raising a factual question regarding the effectiveness of his trial counsel" in his affidavit). A hearing is neither required nor warranted where, as here, the § 2255 "motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." *Smith v. United States*, 348 F.3d 545, 550 (6th Cir. 2003) (quoting *Fontaine v. United States*, 411 U.S. 213, 215 (1973)).[6]

## IV.   Conclusion

For the reasons set forth above, the Court DENIES Petitioner's motion under 28 U.S.C. § 2255 to vacate his sentence. (ECF No. 53.)

There can be no appeal from a final order in a § 2255 proceeding unless the defendant obtains a certificate of appealability. *See* 28 U.S.C.

---

[6] The Sixth Circuit has generally found evidentiary hearings to be necessary where claims for relief under § 2255 turned on unresolved issues concerning what defendants communicated to their counsel or what counsel communicated to them. *See, e.g.*, *Pola v. United States*, 778 F.3d 525, 533–35 (6th Cir. 2015) (defendant who did not file a timely appeal contended that he directed his trial counsel to file an appeal); *Huff v. United States*, 734 F.3d 600, 606–08 (6th Cir. 2013) (defendant contended that he dismissed his initial appeal based on his appellate counsel's flawed legal advice); *Smith v. United States*, 348 F.3d 545, 553 (6th Cir. 2003) (affidavits submitted with a § 2255 motion left "considerable doubt over the nature and quality of the advice [a defendant] received before he made his final decision to reject the government's proposed plea bargain"). Petitioner does not raise a similar factual dispute here that would require an evidentiary hearing to resolve.

§ 2253(c)(1)(B); Fed. R. App. P. 22(b). "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." R. Governing § 2255 Proceedings 11(a). A court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Petitioner does not make this showing. Accordingly, the Court DENIES a certificate of appealability.

IT IS SO ORDERED.

Dated: April 30, 2026
Ann Arbor, Michigan

s/ Judith E. Levy
JUDITH E. LEVY
United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 30, 2026.

s/William Barkholz
WILLIAM BARKHOLZ
Case Manager